United States District Court
Southern District of Texas
**ENTERED**
July 28, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| Feanyichi E. Uvukansi,<br>*Petitioner,*<br><br>v.<br><br>Bobby Lumpkin,<br>Director, Texas Department<br>of Criminal Justice, Correctional<br>Institutions Division,<br>*Respondent.* | § § § § § § § § § § | Civil Action 4:21-CV-1624 |

## Report and Recommendation

Feanyichi E. Uvukansi, a Texas state inmate, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his conviction and sentence for capital murder. ECF No. 1. The respondent answered the petition and filed copies of the state-court records. ECF Nos. 10, 11. At the court's request, Uvukansi filed a reply. ECF No. 13. Having considered the petition, the answer and reply, all matters of record, and the applicable legal authorities, the court recommends that this case be dismissed.

1. *Procedural Background*

On June 20, 2014, a jury in the 174th District Court in Harris County convicted Uvukansi in Cause Number 1353181 of one count of capital murder. ECF No. 11-5 at 499-501. The court sentenced Uvukansi to life in prison. *Id.* The Texas First Court of Appeals affirmed Uvukansi's convictions and sentences on June 2, 2016. *See Uvukansi v. State,* No. 01-14-00527-CR, 2016 WL 3162166 (Tex. App.—Houston [1st Dist.] June 2, 2016, pet. ref'd) (mem. op. not designated for publication). The Texas Court of Criminal Appeals refused Uvukansi's petition for discretionary

review. *See Uvukansi v. State*, PD-0727-16 (Oct. 19, 2016). ECF No. 11-34.

Uvukansi filed an application for a state writ of habeas corpus on November 14, 2017, raising one claim of prosecutorial misconduct under *Giglio v. United States*, 405 U.S. 150 (1972), one claim of ineffective assistance of trial counsel, and a claim of cumulative error. ECF No. 11-55 at 5-22. The state habeas trial court held a lengthy evidentiary hearing on Uvukansi's claims. ECF Nos. 11-48, 11-49. Based on its review of the trial proceedings, Uvukansi's application and its exhibits, the State's response and its exhibits, and the evidence presented at the hearing, the state habeas trial court entered findings of fact and conclusions of law and recommended that the habeas application be denied. ECF No. 11-54 at 155-82. The Court of Criminal Appeals denied Uvukansi's application without written order on April 14, 2021. *In re Uvukansi*, Writ No. 88,493-02 (Tex. Crim. App. Apr. 14, 2021). ECF No. 11-39.

On May 17, 2021, Uvukansi filed his federal habeas petition under 28 U.S.C. § 2254, raising two claims:

1.   The prosecutor knowingly introduced false testimony from witness Oscar Jeresano concerning whether he had been promised a benefit in exchange for his testimony.

2.   Trial counsel provided ineffective assistance by failing to elicit testimony that, in exchange for Jeresano's testimony, the prosecutor had agreed to write a letter detailing Jeresano's assistance at Uvukansi's trial to the federal judge presiding over Jeresano's pending criminal case.

ECF No. 1 at 5-8. The respondent answered the petition, contending that the petition should be denied on the merits. ECF

No. 10. At the court's request, Uvukansi filed a reply to the answer. ECF No. 13.

While his federal petition was pending, Uvukansi filed a petition for a writ of certiorari with the United States Supreme Court, seeking review of the denial of his state habeas application. ECF No. 15. After being notified of the pending certiorari petition, this court stayed this action pending a decision from the Supreme Court. ECF No. 16. After the Supreme Court denied certiorari, this court lifted the stay, and these proceedings recommenced. ECF No. 17.

### 2. Factual Background

The First Court of Appeals summarized the evidence presented at trial as follows:

> Frazier Thompson testified that on June 20, 2012, immediately after his performance at a rap concert at The Blue Room nightclub (the "nightclub"), he walked outside into the nightclub's parking lot and towards his car, which he had valeted "right in front of the club." Within a "few seconds" of stepping into the parking lot, someone shot him in the back. Frazier, who was standing in front of the nightclub, near the valet stand, did not see the shooter. However, he knew the two other men, the complainants, Coy Thompson and Carlos Dorsey, who were shot and killed in the parking lot.
>
> Oscar Jeresano testified that on June 20, 2012, the nightclub hosted a rap concert, during which he valeted patrons' cars. He explained that "the whole night was pretty busy," "pretty, pretty hectic," and people were everywhere "coming in and out." When the concert "let out . . . around 2:00, 2:10 [a.m.]," "a lot of people started gathering" in the parking lot, and

3

there was "a big pile of people" "all over the parking lot." Jeresano estimated that "100 people or more" had congregated outside of the nightclub.

While Jeresano was speaking with a woman about her car, he "heard shots" fired, immediately "turned around," and saw a "flame coming out of [a] gun." He also saw approximately eighty to eighty-five percent of the face of the shooter. Jeresano focused on the shooter, who had a "determined look" on his face, like "he knew what he was going for," and "[i]t wasn't [just] a random thing." While the shooter, who held his arm "straight out" with a "gun in his hand," was moving, Jeresano "[d]odged for cover behind or to the side of a [car]" and saw "bodies drop[ ]" to the ground.

Jeresano further testified that he heard approximately fifteen shots fired in the parking lot, saw only one shooter, and "witness[ed] three people die." He noted that the shots had been fired "one after another," with "no pause [in] between them," and he did not see "anybody . . . shooting back." In other words, this was not a "shoot out" between several people. The shooter fired his gun "towards the crowd" of people outside of the nightclub, "shooting all over the place." Although Jeresano did not see "exactly where [each] bullet went," because "there w[ere] too many people" and he could not "follow" each individual bullet, he did see the shooter "shooting at the crowd" of people.

After the shooting, Jeresano met with a Houston Police Department ("HPD") officer, who showed him a photographic array containing a photograph of appellant and five other men with similar physical

characteristics. He recognized the shooter in the photographic array "right away," and he was "[one] hundred percent" certain of his identification. Jeresano identified appellant as the shooter that he saw at the nightclub on June 20, 2012.

HPD Officer W. Reyes testified that on June 20, 2012, he was dispatched to the nightclub, where, upon his arrival, he saw in the parking lot, which was "packed" and "full," "a large crowd" of "over 100" people "running around frantic." "[S]hots" had been fired "all along the parking lot," indicating that the shooter was "moving" when he fired his gun, and three individuals were pronounced "deceased" at the scene. During Reyes's testimony, the trial court admitted into evidence photographs of the bodies of the two complainants where they had been slain in the parking lot.

HPD Officer W. Tompkins testified that when he arrived at the nightclub's parking lot on June 20, 2012 after the shooting, he saw a "very large amount of people." He recovered eighteen bullet "casings" from the parking lot; however, "because of the large amount of people and vehicles," it was "highly possible that [he] might have missed some."

HPD Officer C. Cegielski testified that on June 20, 2012, "[t]here [was] a concert at a club, [with] a lot of people. [When the] [c]lub . . . let out, [a] shooting happened in the parking lot. Three people were killed at the scene." He met with Jeresano after the shooting and showed him several photographic arrays, all containing photographs of six "males of similar characteristics, age, [and] facial hair." One array

contained a photograph of appellant and five other men. Jeresano "went straight to [appellant's] picture" and said "this is the guy with the gun." Jeresano also stated that "he only saw one person with a gun" that night, he looked at the shooter "face-to-face," and he heard "a lot of shots" fired, about "15 to 20." According to Cegielski, no one other than appellant was ever "identified as the shooter."

Officer Cegielski obtained a "pocket warrant" for appellant's arrest. And, following his arrest, appellant waived his legal rights and gave a statement, which Cegielski recorded. HPD officers then obtained a search warrant to view the contents of appellant's cellular telephone. Officers ultimately recovered two photographs, State's Exhibits 55 and 56, from appellant's telephone, and Cegielski identified the individuals pictured in the photographs at trial.

HPD Officer J. Brooks testified that Jeresano told HPD officers that he saw appellant "shooting," and although Jeresano did not see exactly "where [each of] the bullet[s] went," he saw "the direction of the shooting," which was "into . . . the crowd." According to Brooks, "[t]he description of where [Jeresano] said" he saw appellant "shooting" was in accord with the location of the bodies of the two complainants in the parking lot of the nightclub. Brooks also testified that the two photographs "recovered from [appellant's] cell phone," State's Exhibits 55 and 56, were taken an hour after the shooting.

*Uvukansi*, 2016 WL 3162166, at *1-2 (cleaned up).

### 3. *Standard of Review under 28 U.S.C. § 2254(d)*

Uvukansi's petition for federal habeas corpus relief is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254; *see also Woodford v. Garceau*, 538 U.S. 202, 207 (2003); *Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997). Review under AEDPA is "highly deferential" to the state court's decision. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). To merit relief under AEDPA, a petitioner may not simply point to legal error in the state court's decision. *See White v. Woodall*, 572 U.S. 415, 419 (2014) (stating that being "merely wrong" or in "clear error" will not suffice for federal relief under AEDPA). Instead, AEDPA requires inmates to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 419-20 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Under AEDPA, federal habeas relief cannot be granted on claims that were adjudicated on the merits by the state courts unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7-8 (2002) (per curiam); *Cobb v. Thaler*, 682 F.3d 364, 372-73 (5th Cir. 2012). The first provision applies to questions of law or mixed questions of law and fact, while the second applies to questions of fact.

On questions of law or mixed questions of law and fact, this court may grant habeas relief only if the state-court decision "was contrary to, or involved an unreasonable application of, clearly

established" Supreme Court precedent. *Richter,* 562 U.S. at 97-98. The "contrary to" clause applies "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone,* 535 U.S. 685, 694 (2002); *see also Broadnax v. Lumpkin,* 987 F.3d 400, 406 (5th Cir. 2021), *cert. denied,* 142 S. Ct. 859 (2022). The "unreasonable application" clause applies "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Bell,* 535 U.S. at 694; *Broadnax,* 987 F.3d at 406. Under this clause, to merit relief the state court's determination "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald,* 575 U.S. 312, 316 (2015) (per curiam) (cleaned up).

On questions of fact, this court may grant habeas relief only if the state habeas court's decision was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2); *see also Martinez v. Caldwell,* 644 F.3d 238, 241-42 (5th Cir. 2011). The state court's findings are "presumed to be correct," and a petitioner seeking to rebut that presumption must do so with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### 4. Discussion

Uvukansi raises two claims in his federal petition, each of which were considered and rejected by the state habeas court based on factual findings made after an evidentiary hearing.

#### a. Prosecutorial Misconduct
#### (Claim 1)

In his first claim, Uvukansi alleges that the prosecutor knowingly introduced false testimony in violation of *Giglio v. United States,* 405 U.S. 150 (1972). He alleges that Oscar Jeresano—the only witness who identified Uvukansi as the

shooter—had pleaded guilty in a federal drug case before Uvukansi's trial, but he had not yet been sentenced. ECF No.1 at 5. Uvukansi alleges that during trial, Jeresano testified that he was facing a federal sentence of ten years to life in prison, and that no one had promised him anything in exchange for his testimony against Uvukansi. *Id.* Uvukansi alleges that this testimony was demonstrably false because the prosecutor had promised before trial to provide a cooperation letter to the federal judge in exchange for Jeresano's testimony. *Id.* Uvukansi asserts that after Jeresano testified, he received a sentence of only three years' probation in his federal case. *Id.*

Uvukansi alleges that the prosecutor's conduct in failing to correct Jeresano's false testimony amounted to a *Giglio* violation, and he asks this court to vacate his conviction and sentence and remand for a new trial. *Id.* at 15. The State responds that Uvukansi has failed to show that the state court's adjudication of this claim was objectively unreasonable when considered in light of the record as a whole. ECF No. 10 at 10.

In *Giglio*, the Supreme Court "made clear that deliberate deception of a court and jurors by the knowing presentation of false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio,* 405 U.S. at 153 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (per curiam)). Under *Giglio*, "the State is not permitted to present false evidence or allow the presentation of false evidence to go uncorrected," *see Moody v. Johnson*, 139 F.3d 477, 484 (5th Cir. 1998), and the knowing use of perjured testimony by the government violates a defendant's right to due process of law. *See Knox v. Johnson*, 224 F.3d 470, 477 (5th Cir. 2000).

"To establish a due process violation based on the government's use of false or misleading testimony, a petitioner must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution

knew the witness's testimony was false." *Fuller v. Johnson*, 114 F.3d 491, 496 (5th Cir. 1997). "Evidence is 'false' if, *inter alia*, it is 'specific misleading evidence important to the prosecution's case in chief.'" *Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)). For evidence to be false, the prosecutor must "actually know[] or believe[] the testimony to be false or perjured; it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements." *Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002). In addition, a witness's testimony is "material" only if the false testimony could "in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154,

Uvukansi's claim that Jeresano testified falsely about his motives for testifying, that the State knew the testimony was false, and that the State failed to correct the testimony was litigated both during the trial itself and in the state habeas proceedings. After considering the trial record, the parties' pleadings, and the evidence presented at the hearing, the state habeas court found that Uvukansi had carried his burden to show that Jeresano's testimony—that no one promised him anything in exchange for his testimony—was false and that the prosecutor knew it was false. ECF No. 11-54 at 172-77. However, the state habeas court found that Uvukansi had failed to show that the Jeresano's false testimony was material in light of all of the evidence presented during trial:

> 111. The Court finds that [Assistant District Attorney Gretchen] Flader told [defense counsel Vivian] King before trial that she promised [Jeresano's federal defense counsel Brett] Wasserstein she would write a letter to the federal judge if Jeresano cooperated with the state's case and testified. (Writ 232, lines 8-12)

112. The Court finds that such evidence may be considered relevant impeachment evidence as it relates to the credibility of Jeresano as a witness and his motive to testify untruthfully.

113. The Court finds, however, that although Flader revealed this information to King as well as information that she would notify the federal prosecutor about Jeresano's cooperation if he testified, for all practical purposes it was for naught. During Flader's presentation of Jeresano's testimony she elicited a sworn response from him that was false, that is, that he had not been made **any** (emphasis added)[1] promises for testifying in court. Further, Flader objected to King asking Jeresano about the information contained in an email that included information about the 5K1 reduction. Flader's objection was sustained and thus prevented King from simply asking specifically if Jeresano knew whether or not Flader would write a letter to the federal judge if he testified. (Writ 63, lines 5-10)

114. The Court finds that the false testimony elicited on direct examination by Flader coupled with his false and misleading testimony on cross-examination by King left a false impression with the jury.

115. The Court finds, however, Jeresano's credibility was impeached on Flader's cross-examination of Wasserstein during the jury trial when Wasserstein testified **that he did explain to**

---

[1]All emphasis and alterations of any kind within the quoted material throughout this Report and Recommendation, and the parentheticals referencing or explaining the emphasis, are original to the quoted material.

**Jeresano that testifying will probably help him when it comes time** for the judge to do the sentencing; but that there was no agreement to what the sentence would be that it would be up to the judge. (Writ 47, lines 17-25; 48, lines 1-4)

116. The Court finds that, even if Jeresano's testimony that *"he was not made any promises"* was regarded to be "false," that testimony was not "**material**" since there is not a ***reasonable likelihood*** that it affected the judgment of the jury since Flader impeached Jeresano through the cross examination of Wasserstein when Wasserstein testified that he did in fact tell Jeresano that testifying would probably help him in his federal court case.

117. The Court finds that although the jury did not hear evidence that if Jeresano testified in the State's case, Flader would write a letter to the federal judge in order to help Jeresano get a reduced sentence, there was other evidence that the jury heard that impeached Jeresano's credibility or that showed he had a motive to testify untruthfully—Wasserstein's testimony on cross-examination by Flader was such impeachment evidence, and on direct examination by King.

118. The Court finds that Jeresano was also thoroughly impeached with the following: (a) he pleaded guilty to a federal multi-kilo narcotics case and was awaiting sentencing, (b) he was subject to a punishment of 10 years to life, (c) he was subject to deportation if convicted, (d) his conditions of bond had been modified for his benefit, (e) his case had been continually reset for approximately two years so that

he could testify in the applicant's trial, (f) Wasserstein planned to notify the federal prosecutors of Jeresano's testimony in the applicant's trial and request that the government file a 5K1.1 motion to reduce his sentence based upon his cooperation, and (g) rather than immediately report his eyewitness account to the police he informed his attorney of his account and several days later gave a statement to law enforcement. *See [Ex parte] Weinstein*, 421 S.W.3d [656] at 667-68 [(Tex. Crim App. 2014)]. (See RR Vol 8 p. 44, lines 13-19)

119. The Court finds that Jeresano's testimony was necessary as he was the only witness called by the State to prove Appellant was the shooter who killed the complainants.

120. The Court finds that although Jeresano was not further impeached with evidence of the letter that Flader would write to the federal judge, its impeachment value or weight could be considered very similar to the impeachment value and weight the jury was able to give to the evidence that Jeresano did in fact know that he could possibly get a sentence reduction in his federal case.

121. The Court concludes the Applicant must still prove his habeas corpus claim by a preponderance of the evidence, but in doing so, he must prove that the **false testimony was material and thus it was reasonably likely to influence the judgment of the jury**. *Ex parte Weinstein*, 421 S.W.3d at 665.

122. The Court finds that although the letter could have been considered to have a cumulative effect with the other impeachment evidence whereby the

jury may have determined that Jeresano was not credible as to his relevant testimony—identifying the shooter, **the Appellant has not established by a preponderance of the evidence that the false statement of**—*"Nope." He had not been promised anything for his testimony (specifically, he had not been promised a letter would be written to the federal judge if he testified)* **was reasonably likely to influence the judgment of the jury**.

123. The Court finds that, for instance, had the issue been that the false testimony was that Jeresano identified appellant as the shooter but there was impeachment evidence to establish Jeresano said he made it all up to gain a benefit in his federal case, then this would be material and reasonably likely to influence the judgment of the jury.

124. The Court finds that in the case at hand, there was no claim that Jeresano gave false testimony about who the shooter was; there was no testimony that Jeresano made a previous statement that he could not positively identify the Appellant in the photo array. Had that been the case, a false statement that Appellant was the shooter would be material and reasonably likely to influence the judgment of the jury.

125. The Court finds that the jury had to make a determination whether Jeresano was telling the truth or not telling the truth about the Appellant being the shooter.

126. The Court finds that the jury was not left without any evidence showing the falsity of Jeresano's statement that *"he was not promised anything for his testimony"*, and they could have determined Jeresano

was not truthful and disbelieved him because of this false testimony.

127. The Court finds, however, because the jury can believe some, none, or all of a witness's testimony, the jury could have determined that Jeresano gave false testimony but that they still believed he properly identified the shooter.

128. The Court finds that Jeresano's false testimony (*that he was not promised anything to testify in court*) is not closely tied to the veracity of his testimony identifying the shooter. Meaning, his false testimony does not permit a reasonable inference to be drawn that he had to be lying about the identity of the shooter; nor does the false testimony mean it was "reasonably likely" to influence the judgment (conviction/sentence) of the jury because the jury had a right to still believe Jeresano's testimony identifying the appellant as the shooter even though they may have believed he was impeached with evidence at trial, and even if they would have heard about the letter that was going to be written to the federal judge.

129. The Court concludes the purpose of impeachment is to attack the credibility of the witness; it does not guarantee that the witness's credibility will be totally annihilated because, once again, the determination of the weight to be given a witness's testimony is solely within the province of the jury.

130. The Court finds that even if the jury gave value to the impeachment evidence, including the letter; there was still evidence that established the veracity of Jeresano's identification of the Appellant, such as the evidence that he was able to confidently

identify the Appellant from a photo array. In addition, the jury could have thought Jeresano was truthful regarding his identification because of his testimony describing how the shooter fired into the crowd corroborated the detectives' observation of how casings were found at the scene.

131. Therefore, the Court finds that Appellant has failed to prove Jeresano's testimony that *"Nope"*, he had not been made any promises to testify in court (*including the promise that a letter would be written to the federal judge*) was "material" such that there is a "reasonabl[e] likelihood" that this false testimony affected the jury's judgment.

ECF No. 11-54 at 177-79. Based on these findings, the state habeas court denied relief.

Uvukansi challenges this denial on three separate grounds. First, Uvukansi contends that the state habeas court's finding that Jeresano's false testimony was not material was contrary to established Supreme Court precedent because the jury should have been specifically told that Jeresano lied. ECF No. 2 at 35. Citing *Napue v. Illinois*, 360 U.S. 264 (1959), Uvukansi argues that "a lie is a lie, no matter what its subject," and he contends that the jury should have been told that the prosecutor had promised to write a letter to the federal judge that could be used in determining Jeresano's sentence so that the jury could assess Jeresano's credibility.

However, to be able to assess Jeresano's credibility, the jury needed to know only that, contrary to Jeresano's testimony, he expected to receive some benefit from testifying; the jury did not need to know the exact mechanics of how that benefit might come about. The state habeas court found, and this court's independent review of the record confirms, that any false impression left by the

prosecutor's questioning of Jeresano was dispelled during his cross-examination, as well as through the direct and cross-examination of Wasserstein during the defense case. By the close of evidence, the jury was well-aware that Jeresano knew before he testified that the federal court would look favorably on him testifying against Uvukansi and would consider his cooperation when imposing his sentence on his federal charge. Thus, the jury had the essential facts it needed to assess Jeresano's credibility. *See, e.g., Brown v. Wainwright*, 785 F.2d 1457, 1464-65 (11th Cir. 1986) ("The thrust of *Giglio* and its progeny has been to ensure that the jury knows the facts that might motivate a witness in giving testimony."); *see also Hill v. Black*, 887 F.2d 513, 517 (5th Cir. 1989) (finding no *Giglio* violation when the defense revealed every essential part of the witness's plea bargain even though the prosecutor had not), *vacated on other grounds*, 498 U.S. 801 (1990). Because any false impression left at the conclusion of Jeresano's direct examination was corrected through further testimony, there is no reasonable probability that, had the jury been told that the prosecutor had promised to write a letter, the result of the proceeding would have been different. Uvukansi has not established that the state habeas court's finding of fact on this point was unreasonable in light of the evidence before it, and so he is not entitled to federal habeas relief on this basis.

Second, Uvukansi contends that he is entitled to federal habeas relief because the state habeas court misapplied controlling Supreme Court precedent by requiring him, rather than the State, to prove that the false evidence was material. ECF No. 2 at 33-39. He argues that once the state habeas court determined that the prosecutor knowingly presented false evidence, the State, as the beneficiary of the constitutional error, had the burden to prove that the evidence was material. But Supreme Court authority does not support Uvukansi's argument.

Both the Supreme Court and the Fifth Circuit clearly hold that the question of whether a false statement is "material" is one of the three elements required to prove that a constitutional violation occurred under *Giglio* and that the burden is on the petitioner to prove each of those elements, including materiality. *See, e.g., United States v. Bagley,* 473 U.S. 667, 685 (1985) (holding that the defendant "is not entitled to have his conviction overturned unless *he* can show that the evidence withheld by the Government was 'material.'") (White, J., concurring) (emphasis added); *see also In re Raby,* 925 F.3d 749, 756 (5th Cir. 2019) ("To establish a due process violation under *Giglio*, a *habeas petitioner* must show '(1) the witness gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false.'" (quoting *Reed v. Quarterman,* 504 F.3d 465, 473 (5th Cir. 2007)) (emphasis added); *Summers v. Dretke,* 431 F.3d 861, 872 (5th Cir. 2005) ("For Summers to prevail under *Napue/Giglio*, he must prove that Dr. Grigson's testimony was (1) false, (2) known to be so by the state, and (3) material."); *Kutzner,* 303 F.3d at 337 (finding that the petitioner had failed to prove all of the elements of a *Giglio* violation, including "that the State knowingly presented or failed to correct materially false testimony during trial"). The petitioner does not prove that a *Giglio* violation occurred until he proves all three elements; proof of falsity alone—without proof of materiality—does not establish a constitutional error. *See United States v. O'Keefe,* 128 F.3d 885, 894 (5th Cir. 1997) ("It is axiomatic that not every lie is material."). Uvukansi cites no authority from any court holding that the petitioner must prove only two of the three elements necessary to establish a *Giglio* violation and that the State must prove the third.

In support of his argument, Uvukansi cites *Bagley* and *Chapman v. California,* 386 U.S. 18 (1967), for the proposition that

the State, as the beneficiary of the error at trial, has the burden to prove that a constitutional violation is harmless. ECF No. 13, pp. 3-4. He then argues that because the question of whether false testimony is material is similar to the question of whether a constitutional violation is harmless, the burden to prove materiality should be on the State. *Id.* But neither *Bagley* nor *Chapman* place the burden of proving the materiality element of *Giglio* on the State. And while the two questions utilize similar standards, that similarity does not support conflating the two separate inquiries into one. *Compare Coleman v. Vannoy*, 963 F.3d 429, 434 (5th Cir. 2020) (noting the similarity between harmless error analysis and the prejudice element of *Strickland v. Washington*, 466 U.S. 668 (1984), but stating that the two differ in important ways, including that "in the former, it is the state's burden to prove harmlessness beyond a reasonable doubt; in the latter, it is the defendant's burden to prove a reasonable probability that the result would have been different"); *see also Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir. 2000) (noting that the standard for determining materiality under *Giglio* is "considered less demanding on the defendant" than the standards for determining harmless error).

To obtain federal habeas relief, the petitioner has the burden to prove that his constitutional rights were violated. *See Williams v. Taylor*, 529 U.S. 362, 388 (2000) ("We all agree that state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated."). In the context of an alleged *Giglio* violation, the petitioner has the burden to prove that the State knowingly presented false testimony that was material. *See, e.g., Bagley*, 473 U.S. at 685; *In re Raby*, 925 F.3d at 756. While the question of materiality may use a standard like that used in a harmless error analysis, the question of whether an error

is harmless does not arise until after the fact of the error itself has been established. The similarity of the standard used does not support eliminating one of the elements of the petitioner's case, nor does it support shifting the burden of proof on one element of the test for a *Giglio* violation to the State.

The state habeas court's decision was not "an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The state habeas court properly placed the burden on Uvukansi to show that a constitutional violation had occurred. To prove a *Giglio* violation, Uvukanski was required to prove that the prosecutor knowingly presented false testimony and that the false testimony was material. Uvukanski has not shown that the state habeas court's thorough and accurate analysis of the materiality element was contrary to the law. Once the state habeas court found that Uvukansi did not prove that the false testimony was material, it correctly concluded that he had failed to prove that a constitutional error occurred. And absent proof of a constitutional error, the issue of harmless error did not need to be addressed. Uvukansi has not shown that the state habeas court misapplied the law, and he is not entitled to federal habeas relief on this basis.

Third, Uvukansi's repeated allegations concerning the prosecutor's alleged culpability do not entitle him to federal habeas relief. Throughout Uvukansi's petition, his brief in support of the petition, and all of his state habeas pleadings, he takes issue with the prosecutor's conduct, first in eliciting the false testimony and then in failing to correct the false impression it left. He seems to contend that he should be entitled to a new trial based on the prosecutor's misconduct alone. But the purpose of the *Giglio* rule is to ensure that the defendant receives a fair trial by ensuring that the jury is not misled by falsehoods; it is a not a rule intended to punish prosecutor. *See O'Keefe*, 128 F.3d at 894 (citing *United*

*States v. Meinster*, 619 F.2d 1041, 1042 (4th Cir. 1980)). Because the record shows that Uvukansi received a fair trial and the jury was not misled, he is not entitled to federal habeas relief as a means to punish the prosecutor for eliciting false testimony.

In sum, Uvukansi does not point to any clear and convincing evidence sufficient to rebut the presumption of correctness afforded to the state habeas court's findings of fact. The state habeas court applied the correct law to the facts it found credible and reached an objectively reasonable determination that Uvukansi failed to prove that the false testimony presented by the State was material to the jury's determination of his guilt. Under the deferential standard applicable to this court's review, Uvukansi has failed to show that he is entitled to relief.

> b.      *Ineffective Assistance of Counsel*
>         *(Claim 2)*

In the second claim in his federal petition, Uvukansi alleges that trial counsel provided ineffective assistance by failing to elicit testimony from either Jeresano or his counsel, Wasserstein, that the prosecutor, Gretchen Flader, had agreed to provide Jeresano with a cooperation letter in exchange for his testimony. ECF Nos. 1 at 7; 2 at 40-41. The respondent answers that Uvukansi has not shown that the state court's resolution of this claim was contrary to or an unreasonable application of federal law, nor was it based on an unreasonable determination of the facts. ECF No. 10 at 18-29.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. U.S. CONST. amend. VI. Claims of ineffective assistance of counsel are governed by the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a habeas petitioner to show both that counsel's performance was deficient and that the deficient performance

prejudiced the defense. *Id.* at 687. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

To establish the deficient-performance prong of *Strickland*, a habeas petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Id.* at 687-88. To meet this standard, counsel's error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687; *see also Buck v. Davis*, 580 U.S. 100, 118-19 (2017). In addition, "because of the risk that hindsight bias will cloud a court's review of counsel's trial strategy, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003) (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)). "The Supreme Court has admonished courts reviewing a state court's denial of habeas relief under AEDPA that they are required not simply to give [the] attorney's [sic] the benefit of the doubt, . . . but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." *Clark v. Thaler*, 673 F.3d 410, 421 (5th Cir. 2012) (cleaned up) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011)). Therefore, "[o]n habeas review, if there is any 'reasonable argument that counsel satisfied *Strickland*'s

deferential standard,' the state court's denial must be upheld."
*Rhoades v. Davis*, 852 F.3d 422, 432 (5th Cir. 2017) (quoting
*Richter*, 562 U.S. at 105).

In addition to showing deficient performance, the habeas
petitioner alleging ineffective assistance of counsel must also show
that he was prejudiced by that deficient performance. *See*
*Strickland*, 466 U.S. at 687. "This requires showing that counsel's
errors were so serious as to deprive the defendant of a fair trial, a
trial whose result is reliable." *Id.* To demonstrate prejudice, a
habeas petitioner "must show that there is a reasonable
probability that, but for counsel's unprofessional errors, the result
of the proceeding would have been different. A reasonable
probability is a probability sufficient to undermine confidence in
the outcome." *Id.* at 694. "[T]he question is not whether a court can
be certain counsel's performance had no effect on the outcome or
whether it is possible a reasonable doubt might have been
established if counsel acted differently." *Richter*, 562 U.S. at 111.
"Instead, *Strickland* asks whether it is 'reasonably likely' the
result would have been different." *Id.* (quoting *Strickland*, 466 U.S.
at 696). "The likelihood of a different result must be substantial,
not just conceivable." *Id.* at 112.

When ineffective assistance of counsel claims are raised in a
federal habeas petition, they present mixed questions of law and
fact that are analyzed under the "unreasonable application"
standard of § 2254(d)(1). *See Gregory v. Thaler*, 601 F.3d 347, 351
(5th Cir. 2010). AEDPA does not permit *de novo* review of counsel's
conduct, *see Richter*, 562 U.S. at 101-02, and a federal court has
"no authority to grant habeas corpus relief simply because [it]
conclude[s], in [its] independent judgment, that a state supreme
court's application of *Strickland* is erroneous or incorrect." *Catalan
v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (quoting *Neal v.
Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (en banc)).

Instead, the "pivotal question" for this court is "whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101; *see also Visciotti*, 537 U.S. at 27. Thus, this court's review becomes "'doubly deferential' because we take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)." *Rhoades*, 852 F.3d at 434; *see also Woods v. Etherton*, 578 U.S. 113, 117 (2016) (per curiam) (explaining that federal habeas review of ineffective-assistance-of-counsel claims is "doubly deferential" because "counsel is 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,'" and requiring that federal courts "afford 'both the state court and the defense attorney the benefit of the doubt'" (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013))); *see also Richter*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so.") (cleaned up). "'If this standard is difficult to meet'—and it is—'that is because it was meant to be.'" *Burt*, 571 U.S. at 20 (quoting *Richter*, 562 U.S. at 103).

Because Uvukansi's ineffective-assistance claim was rejected by the state habeas court, the question for this court is whether that court's application of the *Strickland* standard to the facts it found credible was objectively unreasonable. After the hearing on Uvukansi's claim, the state habeas trial court made the following findings of fact relating to this claim:

> 70. The applicant avers that King was ineffective for failing to properly present impeachment evidence regarding Jeresano's agreement that Flader would write a letter to U.S. District Judge Rainey for his consideration when he sentenced Jeresano. *Applicant's Writ* at 8; *Applicant's Brief* at 27-28.

71. To support his claim for relief, the applicant asserts the following:

Flader informed King at a pretrial hearing that she would write a letter to the federal judge regarding Jeresano's cooperation before he was sentenced (III R.R. at 5-6). Flader did not elicit on direct examination of Jeresano that she would write this letter. Jeresano denied on cross-examination that he might receive leniency in exchange for his cooperation and testimony. (VIII R.R. at 48-49). Wasserstein testified that, after Jeresano testifies, he will notify the federal prosecutor so she could file a 5K1.1 motion, and the judge would decide whether to reduce the sentence. (IX R.R. at 45). King did not elicit that Flader had agreed to write a letter to the Judge on Jeresano's behalf.

*Applicant's Brief* at 27-28.

72. The Court finds the record reflects Flader was appropriately forthcoming that she intended to write a letter to Judge Rainey after Jeresano testified; that the following exchange took place between Flader and King during a pre-trial setting regarding the State's compliance with the defense's motions for disclosure. (III R.R. at 5-6, 25-26)

(MS. FLADER): Number five is: Any relationship that exists between the government and any witness, potential witness, or informant to be inclined, encouraged, or perceived some personal benefit in response to the government or defense request for information or testimony. In regards to that, the State's prosecutor has agreed

to write the federal judge about one of the witness' cooperation in the case. That witness is currently pending a sentencing for a federal drug charge. And we'll discuss that a little bit more in the future, but the State has agreed to write the federal judge about that witness' cooperation in the case.

MS. KING: I'd like that witness' name on the record, please.

MS. FLADER: Oscar-I'm trying to remember his last name.

MS. KING: I think I wrote it down on this next deal as I know it.

MS. FLADER: I don't know what you wrote it down on.

MS.-KING: I know you don't. I'm sorry.

THE COURT: You've got the name, right?

MS. FLADER: Oscar Jeresano.

THE COURT: Okay.

MS. FLADER: All right. The next one is a request –

MS. KING: Let me ask one more question, please, to the prosecutor on that. And Oscar Jeresano, I believe he pled guilty to a federal offense in the federal district—Southern District of Texas, Victoria, if I'm not mistaken, possibly in 2012 or '13. And the question is for the record: Is his case—is he awaiting sentencing until after he testifies in the State's case against my client, Feanyichi Uvukansi?

MS. FLADER: The information that I have is he is awaiting sentencing and his defense

attorney has been asking for continuances on that sentencing until after this case has been completed.

MS. KING: And I just want to make sure it's clear. Based on your information, Madam Prosecutor, Mr. Oscar's defense lawyer is asking the Federal Court to delay sentencing until after he testifies against Uvukansi in this case?

MS. FLADER: Yes.

THE COURT: Okay.

. . . .

MS. FLADER: Okay. Number four is the federal plea agreement to cooperate with the State in this case for Oscar Jeresano. There was no plea agreement for that witness to cooperate in this case. Any agreements made with the witness, there have been no agreements other than what was previously put on the record that the State did tell defense counsel for Mr. Jeresano that she would write a letter to the federal judge informing him of the witness' cooperation on this capital murder case.

MS. KING: And I'd ask: Was that done in writing—by e-mail or in writing, that commitment?

MS. FLADER: I believe I just told him.

MS. KING: If it was via e-mail or any written form, I would ask that that be provided to defense counsel.

MS. FLADER: Sure.

MS. KING: Thank you.

73. The Court finds that King called Jeresano's attorney Wasserstein as a witness to impeach Jeresano; that during direct and cross-examination of Wasserstein, the jury heard the following testimony regarding a possible downward departure in Jeresano's federal sentencing as a result of his testimony in the applicant's case. (IX R.R. at 40-49):

(BY MS. KING) Q. And after he testifies in this trial, you will inform the prosecutor, the United States prosecutor that he did testify in exchange for the prosecutor to file a Federal motion for the judge to reduce his sentence; is that correct? If you would like I could show that to you.

A. Well, for the most part I'm going to let Patty Booth, who is the assistant U.S. attorney know that he's testified and ask them to file a motion. It's called a 5K1 motion in which the Government will file and the judge will see it and he'll decide if he's going to reduce the sentence based on his cooperation with the United States Government.

. . .

(BY MS. FLADER) And as his attorney are you trying to get him the best possible deal?

A. Absolutely.

Q. Have you ever explained the potential for this, I don't even know what it's called, 5K1; is that right?

MS. KING: Yes, ma'am.

MS. FLADER: 5K1.

MS. KING: 1.1.

Q. (BY MS. FLADER) 1.1 to be filed after he has cooperated with this case?

A. I haven't explained to him what a 5K1 is. I have told him that him testifying will probably help him when it comes time for the judge to do the sentencing, but that there's no agreement between the Government and the defendant as to what the sentencing is going to be. It's going to be up to Judge Rainey in Federal Court.

Q. (BY MS. FLADER) And you testified that you've asked for resets, for his sentencing to be reset. Why have you done that?

A. For a few reasons, number one, I'm hoping that his cooperation with the State is something that I can ask the assistant U.S. attorney to file this 5K1 motion to possibly get his sentence reduced. Also, from my understanding and from practicing that once somebody goes into Federal custody, it's difficult to get them out to testify in court.

74. The Court finds from the trial and writ evidentiary hearing records that King's trial strategy regarding impeaching Jeresano included an exploration of the details of a possible downward departure of his federal sentence premised upon his cooperation with the State in the applicant's case; that to implement this strategy, King questioned Jeresano and Wasserstein about the details of Jeresano's federal plea bargain; that King felt it was strategically unnecessary to question Jeresano or Wasserstein about the letter Flader intended to write; that the following portions of King's testimony at the writ

29

evidentiary hearing support the Court's finding (I W.R. at 257-60, 306):

(BY MR. SCHAFFER) Q. Why didn't you impeach him with the plea agreement?

A. I thought I had made my point by talking about it in front of the Court and by subpoenaing his lawyer to talk about the agreement in case he was not smart enough to know that is what we called it.

. . . .

A. I did not make a bill because I believe that Judge Price sustained—he did sustain the objection. But my trial strategy was to bring in his lawyer, to talk to his lawyer about the agreement because I really believe that Mr. Jeresano just wasn't smart enough to understand what his agreement was. I mean, he knew what he was doing. So I went as far as to call the lawyer, which is unusual in trial, but I did, and his lawyer testified. So I was going to get to it another way.

Q. Well, then, Mr. Jeresano wasn't honest enough to admit it.

MR. REISS: Objection, argumentative.

THE COURT: Sustained.

Q. (By Mr. Schaffer) But the only way to challenge the judge's ruling would be to make the bill, correct?

A. That's not the only way.

Q. Okay. Well, then –

A. I mean, I—well, I was trying to win the trial. I was trying to get to the evidence so that I

could argue it before the jury that the guy had an agreement and he knew it. So I wanted his lawyer to say he had an agreement and he told him about the agreement, which I believe his lawyer did.

Q. Now, why didn't you ask Mr. Wasserstein whether Ms. Flader had agreed to write a letter to the judge regarding Jeresano?

A. Because I thought by Jeresano's lawyer explaining that his client was testifying and expecting to get a downward departure answered—that was what I wanted. I wanted the jury to know that was the bias and that the lawyer explained it.

Q. Well, but Ms. Flader had represented to the jury through Jeresano's testimony that he was testifying because his uncle had been murdered and he wanted to help the victims' families, not that she agreed to write a letter for him, correct?

A. I understand that, but I couldn't get him— they wouldn't let him testify. I mean, that's the way—that's my approach in trying to get the information out. But there was an agreement by his lawyer who ultimately did the negotiating with the feds, the federal prosecutor, to get on the witness stand and say there was an agreement that he told his client about. And so that was my point so the jury could then see the guy was lying, that Jeresano was lying.

Q. So why didn't you elicit from Wasserstein that Flader had agreed to write a letter to the judge after he testified?

A. I didn't think it was necessary. It had already been sustained. I thought that the agreement that his lawyer had negotiated was enough.

Q. Well, it had been sustained through questioning Jeresano because the judge said Jeresano claimed he didn't know anything about it but –

MR. REISS: Objection, leading.

THE COURT: I haven't heard the question yet.

Q. (By Mr. Schaffer) But Wasserstein did know something about it, so he would have personal knowledge of that agreement, would he not?

THE COURT: Sustained to leading. Ask another question.

Q. (By Mr. Schaffer) Would Wasserstein have personal knowledge of the agreement with Flader?

A. Yes.

Q. So if the jury was going to find out about the letter, based on Judge Price's ruling, would it have to find out through Wasserstein rather than Jeresano?

A. You know what, hold on. I'm sorry. I misstated something. I misunderstood your question. I meant that Wasserstein, the lawyer, would know because he had the agreement with the federal prosecutor, as I stated a few comments ago, not necessarily with Gretchen. I didn't know

32

about what he knew about with Gretchen because this deal was all based on the federal prosecutor.

Q. Well, but Flader had disclosed to you before trial that she had made an agreement with Wasserstein to write the letter to the judge.

A. Yes, sir. But in my mind, that wasn't the dispositive fact. To me, I mean, the federal prosecutor could have asked anybody on that team—Gretchen didn't try that case by herself, she had a co-counsel. So the federal prosecutor, based on my experience, could have talked to either one of them or the federal prosecutor could have looked on JIMS and saw there was a conviction and just gave him the 5K. I didn't think a letter was dispositive of giving a 5K. I thought it was his testimony and conviction.

Q. The letter would have impeached his testimony that he had no motive to testify for any reason other than to help the victims' families, wouldn't it?

MR. REISS: Objection, leading.

THE COURT: Sustained.

Q. (By Mr. Schaffer) How could you have used the letter to impeach his testimony on direct examination regarding his motive?

A. I could have used it to further my theory that he was doing it only to get a benefit, but I didn't think that was the only way. I thought the best way was to show that the night of the melee with hundreds of people in the parking lot, he did not come forward and tell the police what he saw. I never—it was always suspicious to me that he

33

would wait and go to a lawyer that's representing
him on his federal case to then get with the
prosecutors instead of being a good citizen that
night and reporting what he saw that night. I
thought—that was my trial strategy to show that
he wasn't right, that he was a liar because he
didn't come forth that night. I didn't get into the
details that you're getting into because that's
obviously what your trial strategy would have
been. Mine was different.

. . . .

[BY MR. REISS] Q. But just so the record is
absolutely clear

A. Okay.

Q. -- please explain your trial strategy as to
why you did not ask Mr. Wasserstein the question
about the letter.

A. Okay. I knew, based on my federal
experience and by talking to Mr. Wasserstein
pretrial, that the prosecutor was going to give him
a downward departure if he testified truthfully. I
could not get him to say it exactly. I couldn't really
get him to say it pretrial other than, "We talked
to him. Yes, he's going to get something, I don't
know what," which in actuality in federal cases is
true. You don't know what you're going to get
because the judge makes the final decision. But if
I try to ask the question once or twice and they
keep evading the answer, I'm just not going to
keep asking. I try to get it another way. But I
thought that when I talked to his lawyer, his
lawyer gave me a lot of information that's, you

know, unusual in a trial because I thought he
basically admitted that his client had a deal.

75. Considering the applicant's averment in the
context of the trial record, the writ evidentiary hearing
record, and well-established jurisprudence regarding
deference to trial counsel's strategic decisions, the
Court finds the applicant's claim to be unpersuasive;
that King's performance was a reasonable, informed
strategic choice and in accord with prevailing
professional norms. *Strickland*, 466 U.S. at 698-700.

ECF No. 11-54 at 167-72.

The state habeas court found that King investigated the
circumstances surrounding Jeresano's cooperation with the State
and its potential impact on his federal sentence, developed a trial
strategy intended to establish for the jury that Jeresano's
testimony was biased by his desire to improve his federal sentence,
and tried to execute that strategy during trial. When the trial court
sustained the State's objection to King's questions to Jeresano
about the prosecutor's promised letter, she asked permission to call
Jeresano's attorney, Mr. Wasserstein. She then elicited testimony
from him about his discussions with both the state and federal
prosecutors about obtaining a reduced sentence for Jeresano in
exchange for his testimony. Her "conscious and informed decision
on trial tactics and strategy cannot be the basis for constitutionally
ineffective assistance of counsel" unless that strategy is "so ill
chosen that it permeates the entire trial with obvious unfairness."
*Cotton*, 343 F.3d at 752-53. The fact that postconviction counsel
would have handled the matter differently does not establish
deficient performance.

The record shows that the state habeas court considered
Uvukansi's arguments, made credibility determinations based on
the evidence presented at the lengthy hearing and its review of the

trial proceedings, applied the *Strickland* standard to the facts it found credible, and concluded that Uvukansi had failed to demonstrate either deficient performance or actual prejudice as a result of how King dealt with the evidence concerning Jeresano's pending federal sentencing. Uvukansi has not shown that the state habeas court's application of the *Strickland* standard was objectively unreasonable, nor has he pointed to any clear and convincing evidence that would permit this court to conclude that the state habeas court's factual findings were unreasonable in light of the evidence before it. Because the state habeas court's decision was neither contrary to clearly established federal law nor an objectively unreasonable application of that law to the facts in the record, Uvukansi fails to show that the state court's decision was unreasonable under this deferential standard.

## 5. *Conclusion and Recommendation*

The court recommends that Uvukansi's federal habeas corpus petition be **DISMISSED with PREJUDICE**. The court also recommends that a certificate of appealability not issue.

The petitioner has fourteen days from service of this report and recommendation to file written objections. *See* Rule 8(b) of the Rules Governing Section 2254 Cases; 28 U.S.C. § 636(b)(1)(c); FED. R. CIV. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140, 147-49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

Signed at Houston, Texas, on July 27, 2023.

Peter Bray
United States Magistrate Judge